IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYRA G. FORREST, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 09-3014 |
| | : | |
| v. | : | |
| | : | |
| OWEN J. ROBERTS SCHOOL | : | |
| DISTRICT, <u>et al</u>. | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

**JONES, II, J.**                                                              **April 1, 2011**

        Dr. Myra G. Forrest ("Plaintiff") brings numerous claims against the Owen J. Roberts

School District ("OJRSD"), individual current and former School Board members Debbie L.

Bissland ("Bissland"), Karen L. Zelley ("Zelley"), John M. Dutton ("Dutton"), Edward L. Kerner

("Kerner"), and Eugene P. Endress ("Endress"), and a John Doe Defendant (together,

"Defendants").  Before the Court is Defendants' Motion to Dismiss the Second Amended

Complaint (Docket No. 36); Plaintiff's Response (Docket No. 37); Defendants' Reply (Docket

No. 44); and Plaintiff's Sur-Reply (Docket No. 42).  For the following reasons, the Court will

grant the motion in part and deny the motion in part.

**I.      Procedural Background**

        Plaintiff's original Complaint in this matter was filed in July 2009, and it was

accompanied by a Motion for a Temporary Restraining Order and Preliminary Injunction.  After

a teleconference on the record, the Court denied Plaintiff's Motion for a Temporary Restraining

Order only.[1]  Plaintiff subsequently withdrew the remaining portion of her Motion and filed an

Amended Complaint.  Defendants filed a Motion to Dismiss the Amended Complaint.  At the

allowance of the Court, Plaintiff filed a Second Amended Complaint ("Complaint").[2]

Defendants filed the instant Motion to Dismiss in response.

## II.  Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation

and citation omitted).  After the Supreme Court's decision in Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937,

1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[1] This Order was entered by United States District Judge Joel Slomsky, serving as Emergency Judge for this Court.

[2] Plaintiff's First Amended Complaint was filed as of right under the Federal Rules of Civil Procedure.  The decision to allow the filing of a Second Amended Complaint was made by the Court upon the filing of a motion to dismiss and without any comment or judgment as to the viability of Plaintiff's claims.  See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007).  As should have been clear to the parties, the Court has never made any judgment regarding the viability of Plaintiff's claims prior to this ruling.  Suggestions to the contrary are misplaced and unwelcome.  As a greater issue, the Court is concerned with the level of vitriol in briefing that tends to sway off the mark of the issues at hand and into the realm of personal antagonism.  In future briefing, the parties are strongly cautioned to confine their commentary to the specific legal issues under consideration.  The Court expects respect and collegiality to be the rule and not the exception.

alleged." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556). This standard, which

applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted

unlawfully." Iqbal, 129 S.Ct. at 1949. Accord Fowler v. UPMC Shadyside, 578 F.3d 203, 210-

211 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned,

the-defendant-unlawfully-harmed-me accusation.") (internal quotation omitted).

## III.  Facts

For the purpose of deciding the instant Motion, the Court must take all alleged facts as

true. Phillips, 515 F.3d at 233. To be clear, under U.S. Supreme Court precedent, this is

required at this stage of the case to evaluate, under a specific overall standard and the

frameworks of particular legal claims, whether Plaintiff has alleged facts sufficient to establish

that she may eventually be entitled to redress such that her claim(s) should be allowed to proceed

to discovery, summary judgment motion practice, and, potentially, a trial on the merits.

Accordingly, in reciting Plaintiff's averments the Court makes no findings of fact and reaches no

conclusions as to whether Plaintiff will actually prevail at subsequent stages of this case. The

burden remains with Plaintiff to adduce proof to support her allegations and meet her burden

regarding any legal claims that survive the instant Motion to Dismiss.

Plaintiff alleges the following facts in the Complaint.[3]

### A.  Hiring and Job Performance

After an extensive search for a new Superintendent to replace its departing

Superintendent, OJRSD selected Plaintiff for the position. Complaint ¶ 13. Plaintiff entered into

an employment contract with OJRSD on April 4, 2005. Id. at ¶ 14. Plaintiff began working at

---

[3] Quotations are taken verbatim from the Complaint.

OJRSD in June 2005, "with the vision of moving the district, encompassing the administration, teachers and students, from 'good' to 'great.'" Id. at ¶ 15.

Plaintiff avers that the four academic calendar years during which she was superintendent of OJRSD were an unqualified educational success. Id. at ¶ 16. According to Plaintiff: (1) OJRSD students recorded excellent, improved Pennsylvania System of School Assessment scores, id. at ¶ 17; Philadelphia Magazine named OJRSD the 22nd best school district in the eight-county Greater Philadelphia Area, which area comprised one hundred and five area school districts, id. at ¶ 18; and (3) OJRSD was named a "best bang for the buck" district, because its educational outcomes outpaced per-pupil spending, id.

Plaintiff also avers that with her as Superintendent, OJRSD was a great success outside of in-classroom instruction. Id. at ¶ 19. The district's Education Foundation, with what Plaintiff avers to have been her assistance as Superintendent, raised more than $286,000. Id. at ¶ 20. Plaintiff states that this money was used to fund the Owen J. Roberts High School television station, student scholarships, and teacher mini-grants, and to support, enhance and enrich the educational experience of OJRSD students. Id. Plaintiff avers that, despite inheriting building projects totaling more than $118,000,000, which were planned and approved by the School Board prior to her arrival, she found creative ways to locate untapped resources in an effort to keep costs at a minimum and without an increase to taxpayers. Id. at ¶ 21. According to Plaintiff, one example of this effort was securing over $2,400,000 in Access Funding for OJRSD to assist with special education programs, aides and teachers. Id. Plaintiff states that prior to her arrival, OJRSD had only received minimal Access Funding. Id.

Plaintiff also alleges that her guidance enabled the District to keep its taxes to a minimum. Id. at ¶ 22. The average tax increase during the four academic years during which Plaintiff was Superintendent was 3.40 percent. Id. Plaintiff's predecessor had averaged a 6.07 percent tax increase for the four academic years prior to Plaintiff's employment. Id. Plaintiff avers that she increased OJRSD's communication with citizens through innovative use of the media, including the High School television station and personal interaction with township supervisors, parents and other interested residents. Id. at ¶ 23. To keep the community involved with OJRSD, Plaintiff shared, via e-mail to OJRSD personnel and the OJRSD website to the public, insights gathered during visits to one OJRSD school each and every week for her entire tenure. Id.

Plaintiff avers that, along with the Business Administrator and Director of Human Resources, she successfully negotiated a new Teamsters contract to the betterment of OJRSD and without the need for unnecessary lawyer involvement – therefore saving the district tens of thousands of dollars in attorney's fees. Id. at ¶ 24. According to Plaintiff, the School Board approved the contract as presented and without opposition. Id. Plaintiff avers she also proposed and implemented a tax relief program for senior citizens, called Star Fish Ambassadors, in which up to a $500 tax credit could be earned through volunteering at OJRSD. Id. at ¶ 25. Currently, an estimated forty-five (45) senior citizens work at OJRSD as part of the program. Id. In addition, Plaintiff avers that she addressed an important district need by implementing safety and security initiatives to the benefit of students. Id. at ¶ 26.

Plaintiff alleges that, despite those successes and absent any failures, she was the target of unacceptable conduct by certain School Board members. Id. at ¶ 27.

**B.    Interaction with the School Board**

School Superintendents are charged by the Commonwealth of Pennsylvania with monitoring academic programs to ensure that requirements are met, and reporting deficiencies to the School Board (and, ultimately, the Superintendent of Public Instruction).  Id. at ¶ 28. Accordingly, Plaintiff was mandated to report to the School Board.  Id. at ¶ 29.  When Plaintiff became Superintendent in July 2005, she implemented a practice of meeting with the School Board President on a weekly basis to keep him or her updated on the latest information.  Id. at ¶ 30.  Plaintiff included the Assistant Superintendent, Business Manager, Director of Pupil Services, Director of Human Resources, and the Supervisor of Special Projects in those meetings.  Id.  According to Plaintiff, these meetings were uneventful during the tenure of three School Board Presidents – Barbara McMeekin ("McMeekin"), Eric Scheib ("Scheib") and Deborah Eddinger ("Eddinger").  Id.

Plaintiff alleges this changed when Dutton's term as President began.  Id.  Plaintiff avers that Dutton attended approximately four of these weekly meetings in full, but within the first ten minutes of the fifth meeting he stood up, walked out of the room, and slammed the door behind him.  Id.  According to Plaintiff, Dutton canceled the remaining meetings with Plaintiff's central staff during his tenure as President of the School Board.  Id.  Plaintiff states that, when Kerner became President of the School Board in December 2008, he agreed to restart the weekly meetings at Plaintiff's request, but Kerner insisted that Bissland, the Vice-President of the School Board at the time, also attend.  Id. at ¶ 31.  Plaintiff avers that the meetings began in mid-January 2009 and remained fairly consistent through February 2009, however in March 2009, Kerner and Bissland started missing meetings without notifying Plaintiff or her staff.  Id.  According to

Plaintiff, Kerner and Bissland missed eight out of twelve meetings between March 2009 and June 2009.  Id.  Plaintiff alleges that the only meetings Bissland and Kerner attended during the months of March, April and May 2009, were those which occurred on the third Tuesday of the month, which immediately preceded School Board meetings.  Id.

According to Plaintiff, over the 2007-2008 and 2008-2009 academic years, the public sessions of School Board meetings, "evolved into offensive, verbal assaults perpetrated by Defendants Dutton, Endress, Kerner, Bissland and Zelley, without any semblance of professionalism."  Id. at ¶ 32.  The executive sessions, which were closed to the public, "often turned into a form of verbal combat as acted by Defendants Dutton, Endress, Kerner, Bissland and Zelley, resulting in egregious forms of abuse, harassment and efforts of intimidation primarily focused on [Plaintiff]."  Id. at ¶ 33.  "The public and private meetings [were] lengthy, contentious acts of unprofessionalism directed towards Plaintiff and other women who did not share Defendants' . . . opinions or had the temerity to ask questions of Defendants regarding discussed agenda and non-agenda items."  Id. at ¶ 34.  Plaintiff avers that she and other administrators were berated and belittled in public and private meetings, and that their professional opinions were ignored in favor of what Bissland, Zelley, Dutton, Kerner and Endress wanted to do, whether or not it was educationally sound.  Id. at ¶ 35.  Plaintiff alleges that her staff members were told what to do "or else," and foul language and the threat of physical violence were directed towards Board members and Plaintiff when they asked questions or had differing opinions.  As a result, Plaintiff alleges that the behavior of the Board majority "created an intimidating, hostile and offensive work environment."  Id.

Plaintiff avers that Defendants OJRSD and School Board allowed several members, including Dutton, Kerner and Endress, to harass, intimidate and discriminate without fear of repercussion.  Id. at ¶ 36.  According to Plaintiff, each was been verbally abusive, hostile and harassing to her, including the use of sexist and racist language.  Id.  Plaintiff alleges that this resulted "in a work environment fraught with hostility."  Id.  As she sets forth in the Complaint, "[t]he abusive, hostile, harassing behavior, lacking total self-control in regard to their treatment of [Plaintiff], escalated with each passing month."  Id.  More broadly, Plaintiff avers that, beginning on or about December 3, 2007 (i.e., during tenures of Dutton and Kerner as Board President), open meetings and executive sessions were characterized by screaming, arguing and unprofessional behavior by the entire Board majority of Bissland, Zelley, Endress, Dutton and Kerner.  Id. at ¶ 38.

Plaintiff further alleges that Endress, Dutton and Kerner demonstrated their animus towards women by berating any woman that dared express a viewpoint with slurs, and by making other attempts to intimidate the women.  Id.  According to Plaintiff: (1) Endress and Dutton would curse (e.g., "bullshit") and call McMeekin, other female Board members and Plaintiff "bitches," among other slurs, at Board meetings, id. at ¶ 39; (2) Dutton and Kerner would lose control of their tempers and slam things (e.g., tables or chairs) at meetings, id. at ¶ 40; and (3) Dutton attempted to stifle any dissent by physically threatening others, id.  Among other threats, Plaintiff alleges that Dutton specifically told McMeekin that he wished "he could run the meetings like his union meeting, because 'someone . . . would be pulpy after the meeting.'"  Id. Moreover, Plaintiff avers that Dutton would often threaten to settle things outside; he told McMeekin to "shut up you bitch; we can settle this outside."  Id.

According to Plaintiff, Kerner, Dutton and Endress continually talked over and cut off questions or opinions from herself and female Board members in an effort to bully and intimidate.  Id. at ¶ 41.  Plaintiffs avers that this type of behavior happened at most or all meetings between December 2008 and June 2009.  Id.  Plaintiff also avers that Endress and Kerner, in both public and private meetings, showed their animus towards women by continually questioning the hiring of women for positions within the District.  Id. at ¶ 42.  Plaintiff alleges that, during a May 2009 meeting with Plaintiff and the Assistant Superintendent, Kerner asked that more men be hired for positions as a potential cost saving measure to the District: "Do we have to hire young women?  All they do is get themselves impregnated and then we have to hire somebody else."  Id.

In January 2008, Keith Fulmer, a Board member for only one month at the time, was charged with various types of sexual misconduct by a minor female.  Plaintiff alleges that, shortly after she learned of the situation, she called Board President Dutton to discuss the matter and the potential resignation of Fulmer.  Id. at ¶ 43.  Plaintiff alleges that Dutton's only response was stating that the girl making the charge was a "ditz."  Id.  Fulmer was later charged with molesting two minor girls and sentenced to prison.  Id. at ¶ 43 n.1.

Plaintiff alleges a pattern of hostile conduct over the course of a number of specific School Board and committee meetings, including the following:

1. Plaintiff avers that, at a School Board meeting on January 28, 2008, Dutton and others screamed at, ridiculed, and harassed her during a heated argument regarding the firing of OJRSD's previous solicitors and hiring of new solicitors. Id. at ¶ 44.

2.	Plaintiff avers that, at a School Board meeting on March 10, 2008, Kerner and Bissland ridiculed, mocked and demeaned her, other female administrators, and certain Board members.  Id. at ¶ 46.  According to Plaintiff, Kerner and Bissland called into question the integrity and honesty of those women during an argument pertaining to Board protocol and proposed changes to the Human Resources Department.  Id.  Plaintiff also avers that Kerner engaged in disrespectful treatment of Antonia Cramp, the Director of Human Resources.  Id.

3.	Plaintiff avers that, at a necessary and regularly scheduled meeting between she and Dutton on March 11, 2008, Dutton described, in a threatening fashion, how he handled problems of dissension "behind the shed."  Id. at ¶ 47.  Plaintiff further alleges that Dutton indicated during that discussion that he often carried a gun.  Id.

4.	Plaintiff additionally alleges that, at the same March 11, 2008, meeting, Dutton made inappropriate comments of a sexual nature, including discussions of a past girlfriend.  According to Plaintiff, Dutton stated the she reminded him of a former girlfriend who was attractive, intelligent, and strong-willed.  Id. at ¶ 48.  Plaintiff also alleges Dutton stated that, because of these qualities similar to those of his past girlfriend, Dutton was convinced that Plaintiff and he would encounter difficulties (i.e., they would "butt heads").[4]  Id.

5.	Plaintiff avers that, at a School Board meeting on March 17, 2008, she was screamed at, ridiculed, and harassed by Dutton and Bissland during an argument about naming an elementary school.  Id. at ¶ 51.

6.	Plaintiff avers that, at a School Board meeting on June 16, 2008, Dutton cursed, pounded the table and called a female Board member a "bitch" when she questioned and gave an opinion about a decision the Board was making.  Id. at ¶ 53.

7.	Plaintiff avers that, at a School Board meeting on October 13, 2008, the purpose of which was to establish procedure and appoint a new Board member, she was harassed and treated unprofessionally, including the attempted use of intimidation, by Kerner and Dutton.  Id. at ¶ 55.

8.	Plaintiff avers that, at a School Board meeting on November 3, 2008, pertaining to the strategic plan which had previously been approved by the Board, she was screamed at, ridiculed, humiliated, and harassed by Zelley, Dutton, and others.  Id. at ¶ 57.

---

[4] Plaintiff's Complaint states that these comments by Dutton, coupled with Plaintiff's knowledge that the very nature of her employment as Superintendent of OJRSD would require occasional dissent, caused her emotional harm and anxiety.  Complaint ¶ 49.

9.      Plaintiff avers that, at a School Board meeting on December 1, 2008, pertaining to reconfiguration of the Board for the following year, she was publicly disparaged and disrespected by Dutton when he read a prepared statement questioning her honesty, integrity and character.  <u>Id</u>. at ¶ 60.

10.     According to Plaintiff, at a School Board dinner prior to a committee meeting in early 2009, Dutton and Kerner used offensive and racist language by referring to certain residents of Chester, Pennsylvania as "jungle bunnies." <u>Id</u>. at ¶ 63.

11.     Plaintiff avers that, during the March 16, 2009, School Board meeting, Dutton and Zelley screamed at her Plaintiff and made offensive and disparaging remarks about her character in an effort at intimidation.  <u>Id</u>. at ¶ 67.  According to Plaintiff, after shouting down others in the room, Dutton and Zelley accused her of "always try(ing) to make the Board look bad," and told Plaintiff they were sick of her.  <u>Id</u>.

12.     Plaintiff avers that, during a May 15, 2009, meeting with OJRSD secretary Michele Rusk, Kerner used derogatory remarks about various ethnic groups within the community, including people of Middle Eastern descent (<u>i.e.</u>, "dirty towel heads") and Italian-Americans (<u>i.e.</u>, "wops").  <u>Id</u>. at ¶ 69.  According to Plaintiff, when Kerner noticed Ms. Rusk's coffee cup from Dunkin Donuts, he said: "You don't buy coffee from those towel heads do you? You know they're dirty people. They own all of the Dunkin' Donuts and they're trying to take over our country."  <u>Id</u>.  Plaintiff alleges that Kerner also stated "towel heads aren't as bad as the wops were."  <u>Id</u>.  Plaintiff additionally alleges that Kerner offensively and inappropriately touched Ms. Rusk's hair.  <u>Id</u>.

13.     Plaintiff avers that, at an executive session prior to a committee meeting on June 1, 2009, Dutton screamed at, belittled, and made sexist comments towards her. <u>Id</u>. at ¶ 71.  Plaintiff alleges that Dutton made an unprovoked verbal attack, and screamed: "Myra you you have it all wrong. You work for us. We don't work for you. You always want it your way. You have a lot of balls. . . . you make me sick. You make me sick to my stomach."  <u>Id</u>.  Plaintiff further alleges that Dutton screamed, "there is a nigger in the woodpile."  <u>Id</u>.  According to Plaintiff, Dutton yelled so loud that others outside the room, including Deborah Eddinger (past Board member), Laura Catalano (reporter for Mercury newspaper), Karin Suzabail (President of the REA union), various architects, and others, could hear.  <u>Id</u>. Plaintiff states that members of Plaintiff's central staff, the entire School Board, Brian Jason Ford of Dischell, Bartle, Yanoff & Dooley, and Tom Heimbach of Flamm, Boroff & Bacine were also present when this incident occurred.  <u>Id</u>. at ¶ 72.

14.    Plaintiff avers that, also on June 1, 2009, she was banned from an executive School Board meeting in which discussions were had regarding school staff (specifically, the Business Manager's contract), in contravention of her employment contract. Id. at ¶ 73. Plaintiff alleges that, upon questioning the legality of the meeting and the ban on her attendance, the OJRSD solicitor informed Plaintiff that her presence was not allowed and that the meeting was legal. Id.

Plaintiffs alleges that immediately following each of these incidents, she communicated, via telephone calls and in-person meetings, with those to whom she was tasked to report as her supervisors, including Board members McMeekin, Bilinski, LaCoff and/or Scheib, to discuss what she perceived to be offensive, hostile, sexist, racist and unprofessional behavior at the previous meeting. Id. at ¶ 37; 45; 50; 52; 54; 56; 58; 61; 64; 68; 70; 75. Plaintiff also avers that she clearly communicated that the actions reported were inappropriate. Id. at ¶ 37; 45; 50; 52; 54; 56; 58; 61; 64; 68; 70; 75.

Plaintiff alleges that, on or about November 13, 2008, Kerner spoke with Mr. Mike Flick, a former OJRSD special education teacher, about the position of Elementary Supervisor of Special Education and, while doing so mentioned his future plans for Plaintiff. Id. at ¶ 59. According to Plaintiff, Kerner told Mr. Flick that he was going to "take care of Myra Forrest" and that "Myra Forrest would not be at Owen J. Roberts much longer." Id. Plaintiff also avers that "Kerner further stated that he already had the people lined up to accomplish that goal." Id.

Plaintiff avers that, by the end of 2008, "the behavior of the School Board was so appalling, lacking any sense of common decency and any speck of professionalism, that [McMeekin] apologized to the OJRSD community as a whole in a letter to the editor of the Mercury [newspaper]." Id. at ¶ 62. According to Plaintiff, all of the School Board members and the solicitors for OJRSD were present at the School Board meetings and were aware of the

hostile environment between December 2007 and June 2009.  Id. at ¶ 76.  Specifically, Plaintiff

alleges that each was aware of the harassment Plaintiff believes she was forced to endure in order

to perform the essential functions of her job as Superintendent.  Id.

### C.  Conduct of School Board Business

Plaintiff avers that School Board business was frequently conducted in such a way that

significant business of public interest was often not discussed until the time approached midnight

and the public had departed.  Id. at ¶ 65.  Plaintiff alleges that, on March 16, 2009, Defendants

Kerner, Bissland, Dutton, Endress and Zelley sought to discontinue video and audio recording of

School Board meetings to further a goal of avoiding public scrutiny of their conduct.  Id. at ¶ 66.

According to Plaintiff, this effort was met with public outcry, including comments calling the

proposal a step backward from the spirit of an open and transparent government.  Id.

Plaintiff avers that, at each School Board meeting, Kerner, Bissland, Dutton, Endress, and

Zelley knew everything that would be discussed, especially off-agenda items, while the

remaining four Board members were kept in the dark.  Id.  According to Plaintiff, the School

Board conducted multiple non-advertised meetings: (1) on February 14, 2008, to discuss changes

to the Human Resources Department; (2) leading up to the March 17, 2008 Board meeting

pertaining to the naming of the new elementary school; (3) to discuss the replacement of Fulmer

with Zelley; and (4) on June 19, 2008 in a closed session where Zelley was selected as Fulmer's

replacement.  Id. at ¶ 84.  Furthermore, as mentioned supra, Plaintiff alleges that the February 14,

2008 Personnel Committee meeting was held in violation of District policy and in contravention

of Plaintiff's contract, which provided the Superintendent the right to attend any meeting not

discussing matters relating to the Superintendent's performance, compensation, employment, or

matters relating to selection or appointment of a successor.  Id.  On each of these occasions, upon

learning of the meetings, Plaintiff avers that she informed those to whom she was tasked to

report as her supervisors, including Board members McMeekin, Bilinski, LaCoff and/or Scheib,

as well as OJRSD's solicitors.  Id. at ¶ 85.  Plaintiff alleges that she clearly communicated her

belief that the actions reported were illegal under the Pennsylvania's Sunshine Act.  Id.

### D. Evaluations and Termination

Plaintiff avers that, during the 2008-2009 academic school year, her mid-year

performance evaluation and final annual evaluation were rendered worthless and offensive by the

actions of Bissland, Zelley, Dutton, Kerner and Endress.  Id. at ¶ 77.  Plaintiff alleges that those

Defendants agreed to act together to misrepresent her job performance and set forth the worst

possible rating on her evaluations.  Plaintiff avers that, despite her academic and community

achievements, on each evaluation those Defendants maliciously rated her performance as a one in

Educational Leadership, Community Relations, District Operations, Board Relationships and

Personal Characteristics, on a scale of one (low) to five (high).  Id.

Plaintiff also avers that she felt increasingly threatened by Dutton in light of his prior

comments to her that he would rather handle problems in a physical manner and that he rarely

went anywhere without his gun.  Id. at ¶ 74.  According to Plaintiff, on June 2, 2009, during a

telephone conference between Plaintiff and Mr. Tom Heimbach, Heimbach indicated that he was

hard-pressed to remember anything as offensive as Plaintiff's description of Dutton's behavior at

the June 1, 2009 meeting.  Id. at ¶ 75.  Plaintiff states that she explained her treatment and fears

to Heimbach.  Id.

Nevertheless, Plaintiff avers that, although her contract as Superintendent of OJRSD was set to expire on June 30, 2010 (i.e., after the 2009-2010 school year), she had intended to seek renewal of her contract for a term of three to five (3-5) years, as allowed under her contract. Id. at ¶ 91.

In the middle of the June 22, 2009 public School Board meeting, the Board majority called a private executive session. Id. at ¶ 79. According to Plaintiff, during the executive session, Kerner stated: "It has been my goal since I was elected President to get rid of Dr. Myra Forrest." Id. Plaintiff avers that, at this point in the session, Dutton and Zelley began an angry tirade, gesturing at and berating her, while blaming their respective failures in the recent April primary and/or concerns about the November election on her.[5] Id. Thereafter, on a 5-4 vote, the School Board terminated Plaintiff's employment without cause. Id. at ¶ 78. According to the motion, Plaintiff's termination was effective immediately. Id. Plaintiff avers that Dutton, Zelley, Bissland, Endress and Kerner approved the motion over outcry from the citizens in attendance and fellow Board members. Id.

The motion was not an item on the School Board agenda for that night, and Plaintiff alleges that several Board members were given no notice of its inclusion. Id. at ¶ 87. Plaintiff alleges that only the five Board members voting for Plaintiff's termination, and possibly the OJRSD solicitor, knew of its inclusion on the agenda, and that the motion was deliberately

---

[5] Several School Board members, including three of the Board members who voted for Plaintiff's termination (Zelley, Endress and Kerner), were not on the ballot in November 2009 because they had lost in the primary election. Id. at ¶ 80. Zelley, Endress and Kerner served the remainder of their respective terms in "lame duck" status. Id. The only Board member who was on the ballot in November 2009 – Dutton – was not re-elected. Id. Bissland is still serving on the School Board. Id.

presented late in the evening after the majority of citizens had left the meeting.  Id.  After

executive sessions and other delays, the final vote on the motion to terminate occurred near

midnight.  Id.  Plaintiff alleges that, in violation of her contract, she was given no prior notice of

this action until after the motion had passed.  Id. at ¶ 88.[6]

Plaintiff alleges that, on July 30, 2009, Endress and an unknown individual disseminated

her performance evaluations without permission to attendees at a meeting of the "Owen J.

Roberts Taxpayers Alliance," as well as to others, via e-mail and paper copies.  Id. at ¶ 171.

Plaintiff alleges this was done in violation of her employment agreement, which, according to

Plaintiff, mandates that her performance evaluations not be distributed to the public.  Id. at ¶ 172.

Plaintiff further alleges this was done to deliberately injure her reputation and lower her

estimation in the community.  Id. at ¶ 174.

Plaintiff states that she suffered, and continues to suffer, severe stress, anxiety and

ongoing mental, physical and emotional harm as a result of the conduct of Defendants.  Id. at ¶

92.  Plaintiff avers that she has been concerned about her personal safety since the March 11,

2008 meeting with Dutton, and that she has had discussions with her former central staff and the

OJRSD Chief of Safety and Security, Mr. Larry Mauger, regarding her personal safety.  Id.

---

[6] According to Plaintiff, in the week after her termination, public support for Plaintiff
grew, along with public anger towards the School Board members that had supported Plaintiff's
late night termination.  Id. at ¶ 89.  Plaintiff states that citizens created internet sites in support of
her, held protest rallies, and signed both online and door-to-door petitions calling for the
rescission of the June 22, 2009 motion to terminate Plaintiff without cause.  Id.  According to
Plaintiff, at the School Board meeting on June 29, 2009 more than 1,200 residents of the area,
including teachers, students, parents, and other concerned citizens of the OJRSD, expressed their
displeasure with the five Board members who had voted for Plaintiff's termination.  Id. at 90.
This protest meeting lasted till approximately 1:30 a.m., with significant public comment.
Despite pleas throughout the meeting and several motions by other Board members, Dutton,
Endress, Zelley, Bissland and Kerner refused to change their stance on Plaintiff's firing.  Id.

Plaintiff alleges that, starting in early 2008, on the Sundays and Mondays prior to each month's large School Board meeting, she would be physically ill because of what she perceived to be the hostile environment created by Defendants.  Id. at ¶ 93.  Plaintiff also alleges that, by late 2008, for the same reasons, she would also be physically ill in anticipation of committee meetings that were scheduled on other Mondays during each month.  Id.  Plaintiff avers that she has been taking medication to enable her to sleep since late 2007, because of the stress caused by Defendants.  Id. at ¶ 94.  Plaintiff also avers that she sought professional medical assistance, has been diagnosed with "post-traumatic stress," and receives therapy every two to three weeks.  Id.

## IV.    Discussion

Defendants have moved to dismiss Plaintiff's entire Complaint on many grounds.  The Court addresses Plaintiff's claims *seriatim*.

### A.    Claim against OJRSD and School Board for sexual harassment pursuant to 42 U.S.C. § 2000 et seq.

"Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality."[7]  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citing Henson v. Dundee, 682 F.2d 897, 902 (11th Cir. 1982)).  To address this problem, Title VII prohibits gender discrimination in the workplace in the form of harassment "sufficiently severe or pervasive [so as] to alter the conditions of [the victim's] employment and create an abusive work environment."  Id. (internal quotation omitted).  Generally, a court must consider all the

_____

[7] Courts in this Circuit use the terms "sex" and "gender" interchangeably in referring to Title VII discrimination.  See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999).

circumstances regarding a plaintiff's employment, including the frequency and severity of any discriminatory conduct, the physically threatening or humiliating or offensive nature of such conduct, and the effect on the plaintiff's performance and psychological well-being.  Koschoff v. Henderson, 109 F. Supp. 2d 332, 345 (E.D. Pa. 2000).  Title VII claims are frequently referred to as "hostile work environment" claims.  Id.  To support such a claim, an employee must sufficiently plead facts to support reasonable inferences that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a person of the same sex in that position; and (5) the existence of *respondeat superior* liability.  Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).

Defendants contend that Plaintiff fails to aver facts necessary to support the first two elements.  Defendants' reading of the Complaint is far too narrow and relies on unpersuasive or inapposite caselaw given the stage of this case.  A reasonable reading of the Complaint does not, as Defendants maintain, result in the unavoidable conclusion that Plaintiff has pleaded nothing more than a mere "bad working relationship," nor one that was driven solely by "personal animosity," Def's Br. at 6-8, which may alone be insufficient.  It is certainly true that "[v]erbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's gender (or membership in other protected groups)," Koschoff, 109 F. Supp. 2d at 346 (E.D. Pa. 2000) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)), and the allegations in the Complaint do go in part to generalized workplace abuse.  But the Complaint goes further – Plaintiff has alleged more related specifically

to gender.  Averments which go to the undercutting of authority, abuse in front of others, unwarranted criticism, and spreading of false rumors may all go towards a potential finding of Title VII liability motivated by gender.  See Koschoff, 109 F. Supp. 2d at 346 (citing Hurley v. Atlantic City Police Dep't, 933 F.Supp. 396, 408 (D.N.J. 1996) and Spain v. Gallegos, 26 F.3d 439, 447-48 (3d Cir. 1994)).

Plaintiff has alleged multiple specific incidents that directly involve gender as their basis. Moreover, Plaintiff has sufficiently pleaded "pervasive" discrimination by alleging facts which support the inference that illegal actions occurred with regularity over a period of more than a year.  See Andrews, 895 F.2d at 1484.  In short, the Court is satisfied that Plaintiff has met her pleading burden as to all the elements of this claim; under any reasonable reading of the Complaint she may eventually be entitled to relief.  This claim will proceed.

**B.      Claim against all Defendants for due process violations pursuant to 42 U.S.C. § 1983.**

The Fourteenth Amendment of the U.S. Constitution forbids a state from depriving persons of life, liberty, or property without due process of law.  U.S. CONST. AMEND. XIV.  This amendment affords two types of protection: substantive due process and procedural due process. Public employment, however, is not a fundamental right entitled to substantive due process protection.  Nicholas v. Pa. State Univ., 227 F.3d 133, 142-43 (3d Cir. 2000) (collecting cases). Accordingly, to survive a motion to dismiss Plaintiff must allege a procedural due process violation.  To state a Section 1983 claim for a deprivation of procedural due process rights, Plaintiff must allege that: (1) she was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the

procedures available to [her] did not provide "due process of law."  Alvin v. Suzuki, 227 F.3d

107, 116 (3d Cir. 2000); Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984).

As to the first prong, individuals have a liberty interest in reputation.  Hill v. Borough of

Kutztown, 455 F.3d 225, 237-39 (3d Cir. 2006).  Calling someone dishonest or immoral can

seriously damage her standing and association in the community.  Chabal v. Reagan, 841 F.2d

1216, 1223 (3d Cir. 1988); Robb, 733 F.2d at 293-94. When an employer creates and

disseminates a false and defamatory impression about an employee in connection with her

termination, the employer can deprive the employee of a protected liberty interest.  Hill, 455 F.3d

at 238.  Practically speaking, in order to support a claim for violation of liberty interest in

reputation, Plaintiff must properly plead that Defendants caused a stigma to her reputation plus a

deprivation of some additional right or interest.  Id.  This is know as "stigma-plus."  To satisfy

the "stigma" prong, it must be alleged that the stigmatizing statements were: (1) made publicly,

and (2) were false.  Id.   As to the second element, this Circuit has held that a termination from

employment satisfies the "plus," even if the employee lacks a property interest in the job she

loses.  Id.

Defendants' conclusory argument that Plaintiff's claim "immediately fails" is

unpersuasive.  Defendants appear to confuse the requirements at this stage with the proofs

necessary to prevail at the summary judgment stage.  For example, Defendants question

Plaintiff's lack of pre-discovery, detailed support for averments that Plaintiff was "ridiculed,

mocked, and demeaned" and had her "honesty, integrity, and character" stigmatized at highly

visible public meetings.  Moreover, Defendants appear to assert that unless Plaintiff quotes in

word-for-word detail from the individual Defendants' alleged diatribes against her, Plaintiff's

averments must be "disregarded." The Court does not concur with this ultra-heightened interpretation of the reigning pleading standard in the wake of Iqbal and its progeny in this Circuit. Here, upon review of the Complaint, the Court is satisfied that Plaintiff has sufficiently pleaded: (1) stigmatizing statements that may have damaged her standing in the community and (2) termination. Furthermore, Plaintiff has alleged that she was discharged via an improper process. This is sufficient. This claim will proceed.

### C. Claims against Defendants Bissland, Zelley, Dutton, Kerner, and Endress pursuant to the Racketeering and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

Plaintiff's Third and Fourth Counts allege two separate civil Federal Racketeer Influenced and Corrupt Organization Act ("RICO") claims, for violations of 18 U.S.C. § 1962(b) and § 1962(c), respectively.[8] In order to recover under § 1962(b), "a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts." Lightning Lube v. Witco Corp., 4 F.3d 1153, 1190 (3d Cir.

---

[8] These provisions state:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or though collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> © It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. §§ 1962(b); 1962(c).

1993).  In addition "the plaintiff must establish that the interest or control of the RICO enterprise by the person is as a result of racketeering."  Id.  In order to establish a claim under § 1962(c), the RICO plaintiff must plead facts demonstrating: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity."  Sedima, S.P.R.L v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).  As part of alleging RICO violations under § 1963(b) and § 1963(c), a plaintiff must set forth allegations of predicate acts of racketeering, which are listed at 18 U.S.C. § 1961(1).  Id. at 496 n.14.  Here, Plaintiff alleges predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.  To prove mail or wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme.  U.S. v. Pharis, 298 F.3d 228, 233 (3d Cir. 2002); United States v. Antico, 275 F.3d 245, 262 (3d Cir. 2001) (citing United States v. Clapps, 732 F.2d 1148, 1152 (3d Cir. 1984)).  Identical standards apply to the "scheme to defraud" under both the mail and the wire fraud statutes. Antico, 275 F.3d at 262 (citing United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996)).

A pattern "requires at least two acts of racketeering activity," i.e., two acts of mail or wire fraud, within ten years.  18 U.S.C. § 1961(5).  However, "while two acts are necessary, they may not be sufficient."  Sedima S.P.R.I., 473 U.S. at 497 n.14.  The U.S. Supreme Court, noting that a pattern cannot be formed by "sporadic activity," has established a two-prong framework for considering the existence of a pattern – proof of a pattern requires both "a relationship" among the predicate acts and a showing that the acts "amount to or pose a threat of continued criminal activity."  Id.  The "relatedness" prong requires that the predicate acts "have the same or similar

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id.; Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting the partially repealed Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575, et seq.). The "continuity" prong is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Tabas, 47 F.3d at 1292 (quoting HJ. Inc. v. Nw. Bell Tel., 492 U.S. 229, 241-42 (1989)). Thus, a short-term fraudulent scheme posing no threat of future criminal conduct cannot satisfy the continuity requirement. See Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1412 (3d Cir. 1991). One way to show continuity is to establish that the predicate acts of racketeering "are part of an ongoing entity's regular way of doing business." Id. (quoting H.J. Inc., 492 U.S. at 242).

Where a plaintiff alleges fraudulent acts of mail or wire fraud as the predicate acts, she cannot rest on mere conclusory allegations and must state the circumstances constituting fraud with "particularity." Fed. R. Civ. P. 9(b); Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) (citing Saporito v. Combustion Eng'g, Inc., 843 F.2d 666, 676 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049 (1989)). Specifically, "to satisfy Rule 9(b), a plaintiff must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior" or offer some alternative means of injecting precision and some measure of substantiation into her allegations of fraud. See Lum, 361 F.3d at 223-24; Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). In order for a plaintiff to meet Rule 9(b)'s specificity requirements for RICO

allegations involving mail and wire fraud, she must identify the purpose for the communication within the defendant's fraudulent scheme and specify the fraudulent statement, the time, the place, and the speaker and content of the alleged misrepresentation." <u>Werther v. Rosen</u>, Civ. No. 02-3589, 2002 WL 31955983, at *2 (E.D. Pa. Oct. 30, 2002) (citing <u>Annulli v. Panikkar</u>, 200 F.3d 189, 201 n.10 (3d Cir. 1999)).  In order to satisfy this standard, a RICO complaint must explain how specific, identified mailings, interstate wire communications, or bank statements "were false or misleading, or how they contributed to the allege fraudulent scheme." <u>Warden v. McLelland</u>, 288 F.3d 105, 114 (3d Cir. 2002).

<u>Inter alia</u>, Plaintiff alleges that "[u]pon information and belief, Defendants Bissland, Zelley, Dutton, Kerner and Endress, acting as the School Board, conspired, agreed to act in concert, and knowingly committed mail/and or wire fraud in connection with their Sunshine Act violations." Compl. at ¶ 123.  This and other conclusory averments fall far short of the heightened RICO pleading requirements discussed herein.  Plaintiff does not indicate the date, time, or place of any alleged mail or wire fraud, and Plaintiff fails to explain how any specific alleged acts by the Defendants furthered the scheme, or were incident to or an essential part of that scheme.  The Complaint also contains few, if any, allegations as to enterprise, relatedness, or continuity.  Finally, Plaintiff does not offer any particular alternate means of injecting precision to her allegations.[9]  Counts III and IV will be dismissed with prejudice, as the Court concludes

---

[9] The Court also notes that Plaintiff alleges the "scheme" underlying the predicate acts of fraud was the Defendants' acquiring control over the School Board through violations of the Pennsylvania Sunshine Act.  Complaint at ¶ 121; 65 P.C.S. § 701 <u>et seq</u>.  The purpose of the Sunshine Act is to ensure the public's ability to witness and evaluate actions of public officials, and to allow the public to determine if it is being adequately represented. <u>Lee Publ'ns, Inc., v. Dickinson School of Law</u>, 848 A.2d 178, 180 n.2 (Pa. Commw. Ct. 2004); 65 Pa. C.S.A. § 702.

amendment would be futile.

### D. Claim against all Defendants for violation of Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-1428.

In Count Five, Plaintiff alleges that the Defendants violated the Pennsylvania

Whistleblower Law, 43 P.S. § 1421-1428.  The Whistleblower Law provides that "[n]o employer

may discharge, threaten or otherwise discriminate or retaliate against an employee . . . because

the employee . . . makes a good faith report or is about to report, verbally or in writing, to the

employer or appropriate authority an instance of wrongdoing or waste."  43 P.S. § 1423(a)

(1986).  In order to make out a case of retaliatory termination, a plaintiff must plead: (1)

wrongdoing, and (2) a causal connection between the report of wrongdoing and dismissal.

Golaschevsky v. Dep't of Envtl. Res., 720 A.2d 757, 759 (Pa. 2001).  "Wrongdoing includes not

only violations of statutes or regulations that are of the type that the employer is charged to

enforce, but violations of any federal or state statute or regulation, other than violations that are

of a merely technical or minimal nature."  Id. (citing 43 P.S. § 1422 (1986)).

For the purpose of their Motion to Dismiss, Defendants effectively concede that Plaintiff

has pleaded sufficient facts to establish "wrongdoing."  Def's Br. at 23.  Defendants contend,

---

According to the Sunshine Act, "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public..." 65 Pa. C.S.A. § 704.  Plaintiff claims that at each School Board meeting, five of the Board members knew everything that would be discussed at the meeting, especially "off-agenda items," while the remaining four directors were "kept in the dark."  Complaint at ¶ 83.  Thus, Plaintiff appears to imply that Board members spoke to one another on the phone or by email prior to the Board meetings without the entire Board being present. However, Plaintiff has not alleged that a quorum of the Board of Directors participated in any specific pre-meeting communications without public notice in violation of Section 704.  Thus, Plaintiff has not even adequately pleaded the existence of the underlying scheme that Defendants purportedly used the mails and/or wires to perpetuate.

however, that Plaintiff has not adequately pleaded a causal connection between her alleged report(s) and her termination.  In order to sustain a claim based on a causal connection between the report(s) of wrongdoing and the dismissal, Plaintiff must plead facts or surrounding circumstances supporting the inference that the report(s) of wrongdoing or waste led to her dismissal.  See Golaschevsky, 720 A.2d at 759-60; Gray v. Hafer, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994), aff'd, 669 A.2d 335 (Pa. 1995) ("An employee who has been terminated based on a filed report and wants to base his or her complaint on their employer's violation under the Whistleblower Law must specify how their employer is guilty of waste and/or wrongdoing. They must also show by concrete facts or surrounding circumstances that the report led to their dismissal, such as that there was specific direction or information they received not to file the report or there would be adverse consequences because the report was filed.") .

Plaintiff's Complaint alleges that she made multiple good faith reports to the appropriate supervisors regarding, inter alia, "the inappropriateness of the sexist and racist discriminatory comments and sexually harassing and abusive behavior of Defendants," and that Plaintiff informed her supervisors that certain Board members were repeatedly abusive, intimidating, and acted to silence others (including herself).  Complaint, passim.  Plaintiff also alleges that at least one Board member stated it was his goal to "get rid" of her, and that he threatened her with physical violence.  Id. at ¶ 59.  However, while Plaintiff clearly alleges that Defendants threatened her based on performance of her regular duties, comments at meetings, etc..., Plaintiff does not sufficiently allege that Board members threatened to fire her or impose any other adverse consequences specifically because of  her reports of illegal activity.  Indeed, Plaintiff only alleges that she was "terminated without cause by Defendants a little more than one month

after making the good faith reports pertaining to discriminatory comments . . . and within several months of making good faith reports pertaining to Defendants' violations of the Sunshine Law." Id. at ¶ 142.  Although this allegation includes a temporal relationship between Plaintiff's action and her termination, the Court finds that Plaintiff does not offer any other less conclusory allegations to connect her report(s) with her dismissal.  Although this is a close question, the Court concludes that Plaintiff's pleading is too vague to support an inference that the Defendant is liable for the conduct alleged.  This Count will be dismissed without prejudice and Plaintiff will be given leave to amend.

**E.      Claim against all Defendants for Negligent and Intention Infliction of Emotional Distress**

Defendants move to dismiss Counts Six and Seven  on the sole basis that the claims contained therein are pre-empted by the Pennsylvania Workers' Compensation Act ("PWCA"), 77 P.S. § 481 (1974), which provides the exclusive remedy for work related injuries.  Indeed, the PWCA does provide the exclusive remedy for work related injuries, including emotional distress. Papa v. Franklin Minto Corp., 583 A.2d 826, 826-27 (Pa. Super. Ct. 1990).  However, there is a "personal animus" exception to the PWCA.  Under this exception, a plaintiff/employee can recover from a defendant/employer for "injuries caused by the intentional conduct of third parties (including co-workers) for reasons personal to the tortfeasor, and not directed against [the plaintiff] as an employee or because of his employment."  Faust v. Storm, Civ. No. 08-4602, 2009 WL 2143546, *4 (E.D. Pa. July 15, 2009); Jackson v. Lehigh Valley Physicians Group, Civ. No. 08-3043, 2009 WL 229756, at *6 (E.D. Pa. Jan. 30, 2009).  The "critical inquiry in determining the applicability of the [personal animus exception] is whether the attack was

motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship." Joyner v. School Dist. of Philadelphia, 313 F. Supp. 2d 495, 503 (E.D. Pa. 2004) (citing Furgarino v. Univ. Servs., 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000)). Stated differently, "[i]f the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [personal animus] exception." Jackson, 2009 WL 229756 at *4.

Accordingly, claims for injuries that are not work-related and are the result of personal animus may proceed. See, e.g., Wills Eye Hospital v. W orkmen's Compensation Appeal Bd. (Dewaele), 582 A.2d 39 (Pa. Commw. Ct. 1988), aff'd 582 A.2d 857 (Pa. 1989) (injuries caused by personal animosity). These may include claims stemming from sexual harassment. See Heath v. W orkmen's Compensation Appeal Bd. (Bd. Of Probation and Parole) (Heath I), 811 A.2d 90 (Pa. Commw. Ct. 2002), vacated and remanded on other grounds, 860 A.2d 25 (Pa. 2004) (noting that, in suits for injuries occurring as a result of sexual harassment in the workplace, courts have consistently rejected the defense of employers of an exclusive PWCA remedy); Schweitzer v. Lockwell Int'l, 586 A.2d 383, 385 (Pa. Super. Ct. 1991), petition for allowance of appeal denied, 600 A.2d 954 (Pa. 1991) (pursuant to the personal animus exclusion of the PWCA, employee was not required to pursue a remedy against her employer under the PWCA because the sexual harassment was personal in nature and not part of the proper employer/employee relationship); see also Dunn v. Warhol, Pennsylvania Hospital, 778 F. Supp. 242 (E.D. Pa. 1991) (in a Title VII case, relying on Schweitzer and stating that the court "cannot conceive of an instance of sexual harassment of an employee by an employer or others in the workplace which properly could be characterized as employment related").

The Complaint alleges that: (1) Defendants deliberately created a hostile work environment caused by sexual harassment, (2) in that regard, Plaintiff was the subject of personal (as opposed to work-related) animus, and (3) Plaintiff suffered severe emotional and physical harm as a result.[10]  This is sufficient and the claim is not pre-empted by the PWCA.  This claim will proceed.

> **F.**     **Claims against Defendants Bissland, Zelley, Dutton, Kerner, Endress, and John Doe for tortious interference with a contractual relationship and prospective contractual relationship.**

To state a cause of action for tortious interference with contractual relations, Plaintiff must aver facts to support the following elements: (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation or to prevent a prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.  Hillis Adjustment Agency, Inc. v. Graham Co., 911 A.2d 1008, 1012 (Pa. Super. Ct. 2006) (citing Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003), appeal denied, 847 A.2d 1287 (Pa. 2004)).  Fundamentally, the claim must be directed against a defendant who is not party to the contractual relationship.  Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 173 (3d Cir. 2001); Nix v. Temple Univ. of Commw. Sys. of Higher Educ.,

---

[10] As to the final element of injury, in order to sustain a claim for the intentional infliction of emotional distress, a plaintiff must show conduct so extreme and outrageous that it intentionally or recklessly caused him or her severe emotional distress.  See Bock v. CVS, Civ. No. 07-412, 2008 WL 3834266, at *2 (E.D. Pa. Aug.14, 2008) (citations and quotations omitted). Plaintiff has so alleged.

596 A.2d 1132, 1137 (Pa. Super. Ct. 1991). Stated differently, there must be a contractual relationship between the plaintiff and a party other than the defendant. A corporation cannot tortiously interfere with a contract to which it is a party. Id. (citing Menefee v. Columbia Broad. Sys., Inc., 329 A.2d 216 (Pa. 1974)). Moreover, because a corporation acts through its agents and officers, those individuals are not considered third parties to a contract when acting in their official capacities. Avins v. Moll, 610 F. Supp. 308, 318 (E.D. Pa. 1984) (collecting cases); Maier v. Maretti, 671 A.2d 701, 707 (Pa. Super. Ct. 1996). However, a corporation's employee can act as a third party when the employee was acting outside of the scope of employment. Emerson Radio Corp., 253 F.3d at 173 (citing Silvestre v. Bell Atlantic Corp., 973 F. Supp. 475, 486 (D.N.J. 1997), aff'd, 156 F.3d 1225 (3d Cir. 1998) (explaining that acts committed by an agent outside the scope of employment or agency may satisfy the "tripartite relationship" required for a tortious interference claim)).

Here, Plaintiff has not sufficiently pleaded the necessary element of a third party or an official acting outside the scope of his employment. Plaintiff's claims are against officers of the OJRSD. Plaintiff's averments are limited to activities either taken at official School Board meetings or outside of Board meetings in apparent connection with District business. Putting aside merely conclusory allegations and arguments, a careful reading of the Complaint reveals that Plaintiff has not alleged injurious conduct occurring outside of contexts that preclude this claim. While the Defendants may be alleged to have not acted in the best interests of the OJRSD, those allegations do involve their activities as Board members. As such, Plaintiff's claims are against representatives of OJRSD who cannot be the necessary third parties. This Count will be dismissed with prejudice as the Court finds amendment would be futile.

**G.** **Claim against Defendants Bissland, Zelley, Dutton, Kerner, Endress, and John Doe for civil conspiracy.**

It is axiomatic that a cause of action for civil conspiracy can only proceed where there is a cause of action for the underlying tort. Nix, 596 A.2d at 1137 (citing Pelagatti v. Cohen, 536 A.2d 1337, 1342 (Pa. Super. Ct. 1987)). Count Nine alleges the undertaking of various actions for the express purpose of "tortiously interfering with a contracted relationship." Compl. at ¶ 165. Accordingly, Count Nine is dependent on the viability of that tort as alleged in Count Eight. Because Count Eight will be dismissed with prejudice, the Court will dismiss Count Nine with prejudice as well.

**H.** **Claim against Defendants Endress and John Doe for defamation and invasion of privacy.**

**1.** **Defamation**

In Pennsylvania, the elements of a cause of action for defamation are:

(1) the defamatory nature of the communication;

(2) publication by the defendant;

(3) the application of the communication to the plaintiff

(4) a recipient's understanding of the communications defamatory meaning;

(5) a recipients understanding that the communication was intended to apply to plaintiff;

(6) special harm resulting to the plaintiff from its publication; and

(7) abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a) (1978). Defendant's sole ground for moving to dismiss this claim is that the performance appraisals at issue are mere opinions.

At the pleading stage, the Court must determine whether the communication complained

of can be capable of a defamatory meaning.  MacElree v. Philadelphia Newspapers, Inc., 674

A.2d 1050, 1052-54 (Pa. 1993) (citing Baker v. Lafayette College, 532 A.3d 399, 402 (Pa.

1987)); see also Thomas Merton Center v. Rockwell Int'l Corp., 442 A.2d 213, 215 (Pa. 1981)

("If the court concludes that the publication is not capable of defamatory meaning, the case

should be dismissed."); Birl v. Philadelphia Elec. Co., 167 A.2d 472, 475 (Pa. 1960) ("It is the

function of the court, in the first instance, to determine whether the communication is capable of

a defamatory meaning.").  It is settled law that an opinion, without more, does not create a cause

of action for defamation.  Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962).  Rather, the aggrieved

party must plead that "the communicated opinion may reasonably be understood to imply the

existence of undisclosed defamatory facts justifying the opinion."  Beckman v. Dunn, 419 A.2d

583, 587 (Pa. Super. Ct. 1980) (citing RESTATEMENT (SECOND) TORTS § 566 (1976)).  If such is

the case, and if the statements are alleged to be made or published to maliciously "blacken a

person's reputation or to expose him to public hatred, contempt, or ridicule, or to injury him in

his business or profession," Baker, 532 A.2d at 402, or to "impute, to the person to whom it

refers, characteristics and conduct which are incompatible with the proper . . . exercise of a

business," Cosgrove Studio & Camera Ship, Inc. v. Pane, 182 A.2d 751, 753-54 (Pa. 1962),

Pennsylvania courts will recognize potentially defamatory meaning and allow a defamation claim

to proceed.  Tucker v. Philadelphia Daily News, 848 A.2d 113, 124-25 (Pa. 2004); see also

Cosgrove Studio, 182 A.2d at 754 ("[A]ny language which unequivocally, maliciously and

falsely imputes to an individual or corporation want of integrity in the conduct of his or its

business is actionable.").  In evaluating complaints, courts must view the alleged defamatory

statements "in context."  Baker, 532 A.2d at 402.[11]

Plaintiff has pleaded a defamation claim that is sufficient to survive the instant motion.

Viewed in context, Plaintiff has alleged the deliberate and malicious dissemination of appraisals

that profoundly differ from her prior appraisals and specific accomplishments as to go beyond

mere opinion and imply the existence of undisclosed defamatory facts.  Moreover, as pleaded,

the appraisals directly relate to Plaintiff's reputation and her ability to perform her job, thus

having the potential impact of causing a serious, lasting injury to Plaintiff in the eyes of the

public and a limited number of other potential employer school boards. This claim will proceed.

## 2.    Invasion of Privacy

Plaintiff's invasion of privacy claim, however, must be dismissed.  The right of privacy is

a qualified right to be let alone; but to be actionable, the alleged invasion of that right must be

unlawful or unjustifiable.  Lynch v. Johnston, 463 A.2d 87 (Pa. Commw. Ct. 1983).  Under

Pennsylvania law, a claim for invasion of privacy is comprised of four distinct torts: (1) intrusion

upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4)

publicity placing the person in a false light.  Harris by Harris v. Easton Publ'g Co., 483 A.2d

1377, 1383 (Pa. Super. Ct. 1984) (citing Marks v. Bell Tel. Co. of Pa., 331 A.2d 424 (Pa. 1975)).

Based on the Court's reading of the Complaint and the parties' briefing, it appears that Plaintiff

seeks redress under the third of these torts.  Complaint ¶ 178.  The elements of this tort are: (1)

publicity, given to (2) private facts, (2) which would be highly offensive to a reasonable person;

---

[11] Defendants' use of Baker is misplaced.  That summary judgment decision employed a different standard in arriving at a different conclusion.  In any event, the context of Baker is readily distinguishable from this case.

and (4) is not of legitimate concern to the public.  <u>Harris by Harris</u>, 483 A.2d at 1384.

Defendants argue that Plaintiff has failed to satisfy the third and fourth elements of this tort.  Plaintiff, as the Superintendent of OJRSD, was, as alleged, a high profile public official locked in an on-going, well-publicized battle with certain School Board members.  Moreover, her activities on behalf of OJRSD were widely publicized and of interest to the community.  The Court must conclude that, whether or not the commentary contained in the appraisals was true, the subject matter of those appraisals – <u>i.e.</u>, Plaintiff's job performance – was of legitimate concern to the public.  We need go no further than recognizing Plaintiff's inability to plead the fourth prong of the tort.  Plaintiff's invasion of privacy claim will be dismissed with prejudice, as the Court finds amendment would be futile.

## 3.    Immunity

Pennsylvania courts have recognized that school board members entrusted with a policymaking role for the school district are "high public officials" entitled to absolute immunity from state law suits when acting in their official capacities.  <u>Jackson v. Coatesville Area Sch. Dist.</u>, Civ. No. 99-1495, 2000 WL 1185375, *9 (E.D. Pa. Aug. 21, 2000).  However, official immunity does not apply to any act by a high public official that constitutes a crime, actual fraud, actual malice, or willful misconduct.  42 Pa. C.S.A. § 8550 (1980).

Defendant Endress contends that he is entitled to high public official immunity.  It is true that Plaintiff states in the Complaint: "Defendant OJRSD, through the actions of the School Board, specifically Endress . . . breached the contract by disseminating [Plaintiff's] performance evaluations on or about July 30, 2009 to the attendees at the Owen J. Roberts Taxpayers Alliance

meeting." Complaint ¶ 187. By doing so, Plaintiff apparently concedes that Endress was acting as a member of the School Board when he distributed her appraisals, although his actions were taken at the meeting of an unrelated entity. Nonetheless, the Court has concluded that Plaintiff has sufficiently alleged defamation, and the Court also concludes that Plaintiff has sufficiently alleged Endress acted with actual malice or willful misconduct. At the very least, Plaintiff is entitled to discovery, and Endress is entitled to raise this issue again at summary judgment.

## I.      Claim against OJSRD for breach of contract.

In Count Eleven, Plaintiff alleges that Defendant OJRSD breached the employment contract by disseminating, via its agents, Plaintiff's performance appraisals to attendees of meetings of a group called the "Owen J. Roberts Taxpayers Alliance." Defendants argue that Plaintiff's breach of contract claim is precluded because it is "based on a purported obligation that is not set forth in the written contract upon which Plaintiff relies." Def's Br. at 34. Section Four of Plaintiff's employment contract states: "School Board will conduct an annual mid-year job performance evaluation by December 1 and will complete a written final annual evaluation of Superintendent's performance by June 15. *Discussion of performance and review of the annual evaluation shall be conducted in private session limited to the School Board and Superintendent.*" <u>See</u> Compl. Ex. A at 2 (emphasis added). It is settled law that "when a writing is clear and unequivocal, its meaning must be determined by its content alone." <u>Murphy v. Duquesne Univ.</u>, 777 A.2d 418, 429 (Pa. 2001). The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. <u>Steuart v. McChesney</u>, 444 A.2d 659, 661 (Pa. 1982). The Court concludes that based on the plain language of the employment agreement, Plaintiff's breach of contract claim may proceed.

## V. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss will be granted in part and denied in part.  An appropriate Order follows.